**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| DEVORAH DONNELL, M.D., Plaintiff, | Civil Action No.: 20-cv-01744(JCH) |
| v. | **SECOND AMENDED COMPLAINT** |
| PROHEALTH PHYSICIANS, INC. and PROHEALTH PHYSICIANS, P.C., Defendants. | **Jury Trial Demanded** |

Plaintiff Devorah Donnell, M.D. hereby alleges as follows:

## PRELIMINARY STATEMENT

1. At the beginning of the COVID-19 pandemic, Defendants ProHealth Physicians, Inc. and ProHealth Physicians P.C. (collectively "ProHealth" or the "Practice") issued public statements claiming that ProHealth was "focused on doing right by our patients [and] employees" and promising that "we will get through this together."

2. However, Dr. Donnell, a general physician at ProHealth's Bristol, CT location who developed COVID-19 at work, learned that these statements are false.

3. Specifically, in late-March 2020, Dr. Donnell began experiencing COVID-19 symptoms shortly after her medical assistant tested positive for COVID-19, in part because ProHealth failed to provide sufficient personal protective equipment ("PPE") to its medical staff and enact effective policies to protect against the spread of COVID-19.

4. The impact on Dr. Donnell has been severe and she is among the estimated 10% of COVID-19 patients commonly referred to as "long haulers" because they experience "long,

wide and inconsistent" symptoms that lasts for months.[1]

5. While ProHealth initially accommodated Dr. Donnell's need to be absent from work and to have a reduced schedule, ProHealth eventually decided that it was no longer willing to support Dr. Donnell through this difficult time.

6. As a result, on September 2, 2020, only days before Dr. Donnell was supposed to meet with ProHealth executives to discuss her compensation for the third year of her contract, she was abruptly terminated, without warning or the required six-month notice requirement under her employment agreement, because ProHealth claimed that she violated the Practice's policies by accessing ***her own*** electronic medical record.

7. ProHealth has refused to provide Dr. Donnell with the policies that she allegedly violated, and ProHealth only learned of her access because one of her colleagues, who doubted the severity of Dr. Donnell's illness, improperly accessed her medical records.

8. Dr. Donnell also is aware of other ProHealth physicians who have accessed their own electronic medical records without repercussion.

9. In fact, the head physician at ProHealth's Bristol, CT location told Dr. Donnell when he learned of her termination reason, "Since when are you not allowed to look at your own chart? It's your own record!"

10. Dr. Donnell continues to suffer from the long-term effects of COVID-19, and the stress related to the termination of her employment has caused Dr. Donnell even more emotional and physical harm.

---

[1] See https://health.ucdavis.edu/coronavirus/covid-19-information/covid-19-long-haulers.html

## NATURE OF ACTION

11. The unlawful discrimination and retaliation described herein was committed in violation of the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq*. ("FMLA"), the Americans with Disabilities Act of 1990, as amended by the ADA Amendments Act of 2008 ("ADAAA"), 42 U.S.C. §§ 12101 *et seq*. ("ADA"), the Connecticut Fair Employment Practices Act, C.G.S. § 46a-60 ("CFEPA") as well as a breach of her employment agreement.

## ADMINISTRATIVE PREREQUISITES

12. Plaintiff filed charges of discrimination with the Connecticut Commission on Human Rights ("CHRO") and cross filed the charges with the Equal Employment Opportunity Commission alleging violations CFEPA and the ADA.

13. Plaintiff received her Notice of Right to Sue from the EEOC on May 28, 2021 and her Release of Jurisdiction from the CHRO on March 10, 2021.

14. Plaintiff has asserted her ADA claims within 90 days of receipt of the Notice of Right to Sue.

15. A copy of this Complaint will be served on the CHRO, thereby satisfying the notice requirements of the CHRO.

16. Any and all other prerequisites to the filing of this suit have been met.

## JURISDICTION AND VENUE

17. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action involves federal questions regarding the deprivation of Plaintiff's rights under the FMLA and the ADA. The Court has supplemental jurisdiction over Plaintiff's related claims arising under state law pursuant to 28 U.S.C. § 1367(a).

18. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

19. Plaintiff Devorah Donnell, M.D. is a former physician at ProHealth. At all relevant times, Plaintiff was an "employee" under the relevant statutes. Throughout her employment at ProHealth, Dr. Donnell engaged in work in Bristol, CT.

20. Defendant ProHealth Physicians, Inc. is a Connecticut-registered domestic corporation with its principal place of business at 3 Farm Glen Boulevard, Farmington, CT 06032. At all relevant times, ProHealth was an "employer" under the relevant statutes.

21. Defendant ProHealth Physicians, P.C. is a Connecticut-registered domestic professional corporation with its principal place of business at 3 Farm Glen Boulevard, Farmington, CT 06032. At all relevant times, ProHealth was an "employer" under the relevant statutes. ProHealth Physicians, Inc. and ProHealth Physicians, P.C. jointly employed Plaintiff since they controlled the right to hire and fire Plaintiff and set her terms and conditions of employment. ProHealth Physicians, Inc. and ProHealth Physicians, P.C. are collectively referred to herein as "ProHealth" or the "Practice."

## FACTUAL ALLEGATIONS

### I. BACKGROUND

22. Dr. Donnell graduated from the University of Connecticut School of Medicine in 2015 as part of an eight-year combined bachelors and medical degree program.

23. During medical school, Dr. Donnell was selected as a participant in the Urban Service Track Scholar Program, a four-year program designed to train health professionals to

provide care to vulnerable underserved communities.

24. Dr. Donnell also trained one afternoon every week throughout medical school at the ProHealth Family Medical Group in Bristol, CT under the guidance of Dr. Jeffrey Goldberg.

25. Following medical school, Dr. Donnell completed the Tufts Family Medicine Residency at Cambridge Health Alliance.

26. In early 2018, Dr. Goldberg called Dr. Donnell to invite her to work at the Practice after she completed her residency.

27. Dr. Donnell started working at the Practice on October 1, 2018, after negotiating an employment agreement that required six months' notice by the Practice or Dr. Donnell to terminate without cause.

28. Dr. Donnell accumulated a large caseload and was assigned patients with some of the more complex physical and mental health conditions.

29. Dr. Donnell worked tirelessly to treat her patients and served as a model physician for the Practice.

30. In fact, ProHealth featured Dr. Donnell in one radio and two television commercials for recruitment and advertising.

31. She was given a peer-selected BRAVO Award for exemplary compassion and dedicated patient care.

## II. DR. DONNELL CONTRACTS COVID-19

32. On March 18, 2020, ProHealth started to use the Practice as a Respiratory Evaluation Center ("REC") where physicians worked two times a week to assess patients with respiratory symptoms to determine if they needed COVID-19 testing and, on the other days, treated telehealth patients from home.

33. Physicians and the rest of the staff only had one N95 mask to use for these shifts and the Practice lacked effective policies and procedures to prevent cross-contamination of areas exposed to COVID-19.

34. The physicians were also given very limited additional personal protective equipment while treating patients, with medical assistants having access to even less.

35. Dr. Donnell's medical assistant at the time also worked part-time at ProHealth's West Hartford COVID-19 testing site.

36. There were inadequate site cross-contamination policies in place, as in early-to-mid March medical providers and staff were not yet advised to wear surgical masks at the Practice, and many did not yet have N95 masks.

37. Given these working conditions, it is unsurprising that Dr. Donnell started to experience mild COVID-19 symptoms on March 26, 2020, with symptoms becoming more severe by March 31, 2020, at which time she was no longer permitted to work at the Practice's REC.

38. On March 30, 2020, Dr. Donnell learned directly from her medical assistant that she also was sick and that she had tested positive for COVID-19.

39. For the first couple of days of being sick, Dr. Donnell worked remotely doing telemedicine.

40. But on April 3, 2020, Dr. Donnell had to stop working because her medical condition had worsened.

41. Dr. Donnell's COVID symptoms included a respiratory burning sensation, chest/lung heaviness, dry cough, headache, sore throat, lack of appetite, massive fatigue, malaise and myalgias.

42. Though still coughing, Dr. Donnell tried to start treating telemedicine patients again on April 13 and 14, 2020, but this only caused Dr. Donnell's medical condition to worsen with increased chest tightness, shortness of breath, and a restricted airway that made it difficult for her to breathe while talking or doing minimal physical activity.

43. For example, Dr. Donnell had difficulty walking even short distances without it becoming difficult for her to breathe.

44. On April 15, 2020, Dr. Donnell stopped working again, as advised by her ProHealth Primary Care Physician ("PCP"), and continued having progressive respiratory symptoms, shortness of breath, with the addition of nausea, vomiting, gastrointestinal issues and rashes.

45. Dr. Donnell was prescribed various antibiotics, inhalers, and steroids, and was referred to a cardiologist and pulmonologist at the recommendation of Dr. James Ocampo, Regional Medical Director, and Dr. Jennifer Donahue, Chief Medical Officer.

46. Despite the seriousness of her condition, the Practice's Office Manager, Kim Kasparian, harassed Dr. Donnell about returning to work by asking, almost daily, about her symptoms and whether she could return to work.

47. Ms. Kasparian also instructed Dr. Donnell to have her PCP send various letters to ProHealth about her condition and absence from work, then would repeatedly follow up to ask if they had been completed and submitted.

48. Although Dr. Donnell provided the requested information, ProHealth never notified Dr. Donnell of her rights under the FMLA.

49. On May 8, 2020, Dr. Donnell started working on Electronic Health Record ("EHR") tasks remotely that required minimal verbal communication with patients, including

reviewing patient medical records as well as communicating test results and follow up advice electronically.

50. Ms. Kasparian allowed patients to book appointments with Dr. Donnell throughout April, May, and June, requiring Dr. Donnell to provide almost daily updates on her health so the Practice staff could then cancel these appointments 72 hours in advance.

51. Dr. Donnell again tried to resume virtual patient appointments on June 22 and 23, 2020, but her symptoms worsened significantly as a result and she had to stop.

52. Dr. Donnell continued working on EHR tasks for patients through July 20, 2020 when she was finally able to start treating patients again via telemedicine with PCP recommended accommodations for the number of hours per day and number of patients per hour, as her breathing and ongoing respiratory symptoms continued to be problematic for sustained, prolonged periods of talking.

53. Dr. Donnell continues to have ongoing symptoms from COVID-19 including respiratory and cardiac complications, and has been classified as suffering long-term COVID-19 symptoms, also known as a COVID Long-Hauler.

## III. PROHEALTH'S PRIVACY INVESTIGATION

54. On August 19, 2020, Dr. Donnell received an email from Deren Argir, a Privacy Investigator with Optum's Legal Department, asking to schedule a time to speak to her about a privacy issue.

55. The next day, Dr. Donnell spoke with Mr. Argir who explained that he was conducting an investigation because someone from her office had wrongfully accessed her personal medical chart and he wanted to go over the times it was accessed to determine the reason.

56. During the conversation, Mr. Argir mentioned that he noticed that Dr. Donnell had accessed her own chart.

57. Dr. Donnell discussed the reasons why she accessed her medical records, including to determine whether forms related to her absence were completed by her PCP in response to Ms. Kasparian's persistent inquiries.

58. After briefly mentioning that she was not supposed to access her medical record, Mr. Argir said that "***it's not a big deal because you can request copies of your records and see the same info***."

59. Dr. Donnell asked whether this is anything to be concerned about, and Mr. Argir replied that it was not something to worry about and that he would not expect it to be more than a "slap on the wrist."

60. During the call, Mr. Argir also mentioned that he had seen copies of Dr. Donnell's emails to her colleagues at the Practice about the status of her health but did not explain why that was relevant to his investigation.

61. After the conversation, Dr. Donnell emailed Mr. Argir to thank him for his time and for investigating the violation of her privacy.

62. Dr. Donnell also wrote that she would not access her own chart again in the future.

## IV. PROHEALTH TERMINATES DR. DONNELL

63. On the morning of September 2, 2020, Ms. Kasparian reached out to Dr. Donnell to tell her to report to the ProHealth's headquarters to meet with Dr. Donahue at 1:00 p.m. that afternoon.

64. Dr. Donnell reported to ProHealth's headquarters and was brought to an office

with Dr. Donahue and Nancy Roberts, Vice President of Human Resources ("HR").

65. As soon as she sat down, Dr. Donnell was told that she was being terminated for cause for accessing her own medical records.

66. Dr. Donnell was shocked and told Ms. Roberts that she has the right to her own medical records and that she had done so primarily to respond to Ms. Kasparian's questions on the status of her HR health forms.

67. However, Ms. Roberts did not seem to care and responded that Dr. Donnell was supposed to call to request the records like any other patient.

68. Dr. Donnell also asked why she was not given a warning.

69. Ms. Roberts replied, "That's what Deren did. He was investigating you. He gave you a warning."

70. Dr. Donnell explained that it was made clear that the investigation was about a coworker's intrusion into her medical record and that Mr. Argir said that accessing her own chart was not a big deal.

71. Ms. Roberts replied that she doubted Mr. Argir told her that.

72. As Dr. Donnell was leaving in tears, she again asked why there was no warning.

73. Ms. Roberts again replied that she had been given a warning.

74. Later that evening, Dr. Goldberg texted Dr. Donnell that he found out that she was no longer with ProHealth, that he was "devastated" and wanted to know what happened.

75. A few days later, Dr. Donnell spoke to Dr. Goldberg. Dr. Goldberg told Dr. Donnell that he had received an email that she and Dr. H. Andrew Selinger no longer worked at ProHealth.

76. Dr. Goldberg explained that he and others knew what was happening with Dr.

Selinger, but they were confused as to why she had left.

77. Dr. Goldberg explained that Dr. Selinger had been upset that Dr. Donnell was still out sick and went into her chart to look around.

78. Dr. Goldberg also explained that Dr. Selinger emailed Ms. Roberts about his concerns and stated in the email that he had looked in Dr. Donnell's chart.

79. Dr. Goldberg's explanation was consistent with an email that Dr. Donnell had received around June 2020 where Dr. Selinger had proposed hiring someone to replace Dr. Donnell.

80. After Dr. Donnell explained the reason for her termination, Dr. Goldberg sounded surprised and said "***Since when are you not allowed to look at your own chart? It's your own record!***"

81. Dr. Donnell told Dr. Goldberg that she thought she was terminated for being sick with COVID and that she was still receiving her full salary for less work.

82. Dr. Goldberg said that he shared her belief and that it seemed like they had wanted to get rid of her because she had been out sick and that she had been receiving her full salary even though she could not see patients full-time.

83. While Dr. Selinger's intrusion into Dr. Donnell's medical files is a serious issue and should be a terminable offense, Dr. Donnell's accessing her own medical records is something routinely done by medical practitioners both within and outside ProHealth.

84. In fact, Dr. Donnell is aware of numerous other medical practitioners at ProHealth that have accessed their own medical records without any repercussions and were surprised to learn that she was terminated for doing so.

85. Ms. Roberts refused to provide Dr. Donnell with copies of the policies that she

allegedly violated, and Dr. Donnell was not allowed to go into the office to retrieve her personal belongings.

86. About a week after her termination, Dr. Donnell received an unemployment benefits notice from ProHealth falsely claiming that she voluntarily left her employment.

**FIRST CAUSE OF ACTION**
**(Retaliation in Violation of the FMLA)**
***Against All Defendants***

87. Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs, as though fully set forth herein.

88. At all times relevant herein, Plaintiff was an "eligible employee" within the meaning of the FMLA since she worked at least 1,250 hours in the 12-month period preceding her leave.

89. At all times relevant herein, ProHealth was a "covered employer" within the meaning of the FMLA. ProHealth employs 50 or more employees in at least 20 calendar weeks within a 75-mile radius of the Practice's headquarters.

90. Plaintiff was entitled to FMLA because she suffered from an illness that required continuing treatment by a health care provider.

91. By the actions described above, among others, Defendants have retaliated against Plaintiff for availing herself of the rights and benefits of the FMLA.

92. As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the FMLA, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages, liquidated damages, reasonable attorneys' fees and expenses and other relief.

**SECOND CAUSE OF ACTION**
**(Unlawful Interference in Violation of the FMLA)**
***Against All Defendants***

93. Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs, as though fully set forth herein.

94. At all times relevant herein, Plaintiff was an "eligible employee" within the meaning of the FMLA and needed leave because of a serious health condition, and ProHealth was a "covered employer" within the meaning of the FMLA.

95. By the actions described above, among others, Defendants have unlawfully interfered with Plaintiff's right under the FMLA, including failing to advise Plaintiff of her rights under the FMLA and not permitting her to continue to take intermittent FMLA leave.

96. As a direct and proximate result of Defendants' unlawful conduct in violation of the FMLA, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages, liquidated damages, reasonable attorneys' fees and expenses and other relief.

**THIRD CAUSE OF ACTION**
**(Discrimination in Violation of ADA)**
***Against All Defendants***

97. Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs, as though fully set forth herein.

98. Defendants discriminated against Plaintiff on the basis of her known disability and/or perceived disability in violation of the ADA by, *inter alia*, subjecting her to a hostile work environment and unlawfully terminating her employment because of her disability.

99. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the ADA, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages.

100. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the ADA, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of damages.

101. Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of the ADA, for which Plaintiff is entitled to an award of punitive damages.

## FOURTH CAUSE OF ACTION
**(Discrimination in Violation of the CFEPA)**
***Against All Defendants***

102. Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs, as though fully set forth herein.

103. Defendants discriminated against Plaintiff on the basis of her known disability and/or perceived disability in violation of the CFEPA by, *inter alia*, subjecting her to a hostile work environment and unlawfully terminating her employment because of her disability.

104. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the CFEPA, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages.

105. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the CFEPA, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of damages.

106. Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of the CFEPA, for which Plaintiff is entitled to an award of punitive damages.

**FIFTH CAUSE OF ACTION**
**(Breach of Contract)**
***Against ProHealth Physicians, P.C.***

107. Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs, as though fully set forth herein.

108. Plaintiff and Defendant ProHealth Physicians, P.C. entered into a Physician Employment Agreement effective October 1, 2018.

109. Defendant ProHealth Physicians, P.C. terminated Plaintiff without cause, as defined in the Physician Employment Agreement, and breached the Physician Employment Agreement's providing Plaintiff six months' notice.

110. As a direct and proximate result of Defendant ProHealth Physicians, P.C.'s breach of the Physician Employment Agreement, Plaintiff has suffered, and continues to suffer, economic harm for which she is entitled to an award of damages to the greatest extent permitted under law.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A. A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States and the State of Connecticut;

B. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

C. An order requiring Defendants to reinstatement Plaintiff's employment;

D. An award of liquidated damages;

E. An award of punitive damages;

F. An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and

G. Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: July 12, 2021
Hartford, CT

Respectfully Submitted,

**WIGDOR LLP**

By: ______________________________
Michael J. Willemin
(admitted *pro hac vice*)
Christine L. Hogan
(admitted *pro hac vice*)
Alfredo J. Pelicci
(admitted *pro hac vice*)

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
mwillemin@wigdorlaw.com
chogan@wigdorlaw.com
apelicci@wigdorlaw.com

*Counsel for Plaintiff*

**MADSEN, PRESTLEY & PARENTEAU, LLC**

Todd D. Steigman (CT 26875)

402 Asylum Street
Hartford, CT 06103
Tel: (860) 246-2466
Fax: (860) 246-1794
tsteigman@mppjustice.com

*Counsel for Plaintiff*